GRANGER et al. v. PROVIDENCE-WASHINGTON INS. CO.

(District Court, S. D. New York. November 9, 1911.)

1. SHIPPING (§ 39*)—CHARTER—CONSTRUCTION.

A charter party for the carriage of a cargo of lumber "dressed to size," providing that freight should be paid on the basis of standard cross-ties of given size, did not authorize the charterer to assume that rough cross-ties were meant, and to add in loading to the quantity of lumber shown by the bill of lading a percentage equal to the difference between a dressed and rough tie, and such understatement of the cargo, without the knowledge of the master, was a fraud on both the owner and insurer.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148; Dec. Dig. § 39.*]

2. INSURANCE (§ 476*)—MARINE INSURANCE—EFFECT OF UNDERSTATEMENT OF CARGO BY CHARTERER IN BILL OF LADING.

Where charterers intentionally and in accordance with their custom understated the amount of a cargo of lumber in their bill of lading, which fact was material to the risk of an insurer of the cargo as shown by its testimony that, if it had been known, the risk would not have been accepted, and during the voyage it became necessary to jettison a part of the deck load, as claimed, because such understatement induced the master to load an excessive cargo which rendered the vessel unseaworthy, the charterers were at least limited, as against the insurer, by the quantity stated in the bill of lading, even if the policy was not wholly avoided, and cannot recover on the policy, which did not cover a loss of less than 5 per cent., where the cargo delivered was within 5 per cent. of the quantity called for by the bill of lading.

[Ed. Note.—For other cases, see Insurance, Dec. Dig. § 476.*]

In Admiralty. Suit by Harvey Granger and Charles E. Lewis against the Providence-Washington Insurance Company. Decree for respondent.

This is a libel in personam against the underwriters for the value of part of a cargo of dressed yellow pine lumber shipped on the schooner Wellfleet from Savannah, Ga., on October 23, 1908, bound for Norfolk News, which was jettisoned on October 30, 1908, through stress of weather. The lost property was part of a deck load in all consisting of about 125,000 superficial feet. The underwriters concede the loss, the stress of weather, the amount of lumber shipped, and of that delivered. Their defense is based on the fact that the amount put into the bill of lading by the assured was 483,807 feet, instead of the actual amount, 518,000 feet, their theory being that the extra load so shipped without informing the master rendered the ship unseaworthy, affected their right of general average in subrogation, and, the practice being customary with the assured before the loss was underwritten, that the existing intention so to understate the cargo was a fraudulent suppression of a fact material to the loss.

When lumber is dressed as in the case at bar, it will pack much more compactly in a ship's hold than when rough, and this the assured asserts to be the basis of a custom, not only their own, but of the trade generally, not to state in the bill of lading the actual footage as it is, but to reduce it to the footage of the same amount of rough lumber after it should be "dressed," as hereafter stated. The existence of such a custom the respondents dispute, except in so far as the libelants have personally practiced it in former cases.

The charter party between the owners and the libelants provided that the freight should be paid upon the basis of standard ties of given size, but no such ties were in fact shipped. Freight was paid upon all the lumber actually delivered by calculating the actual footage, and then dividing that

amount by the footage of a standard tie. No attention was paid at that time to the amount stated in the bill of lading. The master knew nothing of the extent of his actual cargo, except as he was informed by the bill of lading, and as he might infer from the general appearance of his ship. The largest cargo which he had formerly carried was about 505,000 feet of dry cypress, which is a lighter wood than yellow pine not dried, such as he carried on the voyage in question. The largest cargo of green and dry timber which he had ever formerly carried was 483,000. In his judgment his ship was unseaworthy when loaded with 518,000 feet of green yellow pine. Lumber is sold to the consumer in several ways. It is sold "rough," in which case the buyer gets the actual footage which he orders and· a little more, because the lumber is cut a little larger than the required size, so as to allow for slight variation of the saw. This allowance is not, however, enough to make up for the loss in planing. It is also sold "to be dressed," in which case the buyer gets actually a smaller footage than he orders, because it is planed off by the seller from the size as ordered before delivery, and the planing reduces the size. It is sold "dressed to size," in which case it is originally cut in larger dimensions than as ordered, but is planed down by the seller, so that the buyer gets the full footage required in his order, but pays a somewhat higher price per foot. The order of the case at bar was of the last kind and the lumber was planed.

Hyland & Zabriskie, for libelants.
Harrington, Bigham & Englar, for respondent.

HAND, District Judge (after stating the facts as above).    [1] The first question is of the supposed fraud practiced on the master by the bill of lading. The explanation of Hancock, one of the libelant's witnesses, is as follows: The standard of measurement was in rough cross-ties which, if shipped in fact, would have been larger than their actual measurement in inches. The ship therefore would carry more footage than was represented in the measurement. Dressed lumber, however, measures exactly, and, if the footage of dressed lumber had been converted into cross-ties, it would represent an actual footage of rough cross-ties greater than what the ship carried in fact. In order, therefore, to convert the footage in dressed lumber into an equivalent in rough cross-ties, it was necessary to reduce it by such an amount as would in the aggregate correspond to the actual excess of lumber in the rough cross-ties beyond their measurement in feet. This the libelants did, so that the actual footage, which would be contained in 10,842 rough cross-ties, was the same as the footage of dressed lumber in fact carried, though the measured footage of the cross-ties is less than that of the dressed lumber.

There are two answers to this: First, that rough cross-ties do not contain the extra footage which Hancock asserts; for, as Stroock says, when lumber is sold "rough," the excess is not enough to allow for planing to the size ordered, but only for variations in sawing. The allowance actually made was a planing allowance which is greater. Moreover, the argument is itself unsound, because it implies that although the charter party contemplated a cargo of dressed lumber, and fixed the unit of measurement in feet, the charterers assumed that they might treat the unit as though it were a rough measurement. Their contention was that the charter party meant to ship dressed lumber upon the measurement of rough lumber, because the unit was a rough unit. However, in using the unit of a standard cross-tie, I

think they were assuming a cross-tie of the kind of lumber which the ship was to carry, which was dressed lumber, and that the owners had no intention because they used that standard of allowing the charterer to slip in a greater footage on the theory that the lumber although dressed was to be measured as though rough.

Nevertheless there is a plausibility in such a contention that would make me hesitate to call it fraudulent, were it not that in settling with the owner the libelants insisted upon nothing of the sort, but paid upon the actual footage as converted into standard cross-tie units, without including for any excess. Further, their practice was not confined to cases where the freight was based upon such units, but they assert that they always understated the footage of dressed lumber. Now there was no color of any kind for such a practice as that. It is true that, when lumber is sold "to be dressed," it is shipped at a higher footage than the buyer actually receives, but that is just the opposite of what the libelants did here. There is not the faintest justification in any custom for understating the actual footage when it is dressed lumber. Stroock, the other witness, abandons any subtlety about cross-tie measurement, and says quite frankly that they adopted such a practice because the ship could fill so much more compactly with dressed lumber than with rough, that the owner was getting a great deal of advantage from that kind of cargo. This ignores that the owner bargained for a dressed cargo, and presumably made his price with any such advantage in mind. It would justify any deceit if the charterer thought the charter party favorable to the owner.

There was some question raised of the existence of such a custom in charter parties, but several reputable merchants swore that nothing of the sort existed, except as any dishonest practice in any trade might exist, and I conclude that there is no such general custom. I have been at some pains to state these facts, since the conclusion I must arrive at is that the practice is dishonest to the owner, and, even if it were a custom, would be unlawful. It is urged that the owner eventually got his whole freight anyway, though that only confirms the original dishonesty of the bill of lading, as I have shown. A court need not be concerned with what the purposes of such a practice may be, though one obvious result is to permit the charterer to overload the ship, and so throw on the underwriters a risk they never assumed, which was precisely what was done in the case at bar. It is enough that the practice is plainly not an honest practice, and the law should not recognize it.

[2] The question is whether the concealment of the practice by the assured to understate the cargo is material to the risk in such sense that it invalidates the policy. Since the practice was general with the assured, they must be held to have intended to adopt it in the case of the voyage in question, and that intention was an existing fact, which, if material when realized, they were bound to disclose. That an intention only is enough was decided in Tate v. Hyslop, L. R. 15 Q. B. D. 368, by the Court of Appeal. In that case the assured had made a standing agreement relieving certain lightermen from

liability except for negligence, and they intended to employ these lightermen upon the cargo insured. The practice, which was not uncommon, had become known to underwriters in general, and they had fixed a separate rate, when the assured assented to it and relieved the lightermen from responsibility. The court held that the practice was not so universal that the underwriters were bound to suppose every cargo carried under it, and that, when the assured assented to it, he was bound to disclose that he had. Lord Esher in his judgment says that the release of the lightermen would not in his opinion be material merely because it affected the salvage, but that, after the underwriters had announced that they regarded it as material by fixing separate rates in cases of such release, it became material, and that their announced position in regard to it bound the assured. Lord Bowen agreed, but reserved the question whether or not what so affected the salvage would of itself be material to the risk.

Now, in the case at bar, it is quite true that the practice was at most one which would affect the salvage, in the sense that Lord Esher used that word, because it could not do more than estop the assured, and after him the insurer in subrogation, if he sued upon the contract of affreightment as evidenced by the charter party and the bill of lading. Perhaps, too, it would effect the right in general average, because the assured had been guilty of unfair conduct, a point I do not decide. But, assuming that Lord Esher is right in so saying, that case was not like the case at bar, because here two underwriters have sworn without contradiction that the fact was material, and would, indeed, have led them to reject the risk in toto had it been disclosed. Their testimony is competent, at least in marine cases, and has been customary for many years. A full discussion of the law can be found in the opinion of President (then Judge) Taft in Pennsylvania Mutual Life Insurance Company v. Mechanics' Savings Bank & Trust Company, 72 Fed. 413, 19 C. C. A. 286, 38 L. R. A. 33, 70. A recent case which turned upon just such testimony is Thames & Mersey Marine Insurance Company v. "Gunford" Ship Company, 1911 Appeal Cases, 529. Therefore, even though all facts which affect the salvage may not be material, merely for that reason, nevertheless this particular fact was such.

That there was good reason to reject the risk, at least beyond the amount of the bill of lading, is clear enough. If the loss occurred for some reason which gave recourse against the ship under its bill of lading, certainly the assured would be limited by the amount which he inserted. Pro tanto, his rights under the contract must be limited as he chose to limit them. This, without going any further, is enough to determine the case at bar for this reason: If the assured were limited in their rights to the amount in the bill of lading, and if that limitation avoided the liability of the insurer the amount which at the utmost he might recover over against the ship under the charter party, then there was no loss under the policy, because the difference between the lumber delivered, and that stated in the bill of lading was not 5 per cent., and a loss of less than 5 per cent. the insurer did not underwrite.

Whether or not the underwriters were reasonable in thinking that the whole risk should be rejected need not be considered, though there

are many respects in which it is clear why prudent underwriters might do so. For example, such a practice takes from the master one way of ascertaining from his past experience whether his ship is overloaded. It is no answer to say that he can learn that with his own eyes, for it is obviously unfair to try to deceive him with what purports to be a true document, even though in spite of it he might discover the fraud. In the case at bar the extra load may very probably have had very little visible effect upon the vessel, yet there is good reason to suppose that the master would not have taken it on if he had known it, and that it was an improper burden for the ship, since she had no difficulty after she had been eased of it. Again, in any proof against the ship in general average the insurer would be faced at the outset with false evidence, competent against him, which he must disprove with unusual completeness, even if it did not put him out of court altogether.

All these reasons apply to that portion of the risk which exceeds the amount of the bill of lading, and, together with the absolute release of any recourse against the ship pro tanto, leave me without any doubt that a prudent underwriter would reject so much of it as should not be stated fairly. That is all I need decide here for the reasons I have given. It is perhaps strange that there seems to be no case in point but Tate v. Hyslop, supra, and that that case is somewhat inconclusive. However, the case at bar like that turns only upon the question of fact, as to what is material. The English marine insurance act of 1906 is only a codification of the pre-existing law, and in section 18 (2) it says:

"Every circumstance is material which would influence the judgment of a prudent insurer in fixing the premium, or determining whether he will take the risk."

The uncontradicted proof here is that the practice in question was such a circumstance.

Finally, there are two other considerations: First, in marine risks, it is immaterial whether or not the material fact was fraudulently or willfully concealed, provided that it actually affected the risk. Carter v. Boehm, 3 Barr. 1905. This practice was not a custom in the trade and underwriters are not chargeable with information of it. In this view it becomes unnecessary to determine whether or not there was a breach of the warranty of seaworthiness.

Libel dismissed, with costs.